Gerald Thomas RINGER, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12915.

Court of Criminal Appeals of Oklahoma.

Oct. 26, 1960.

Homer Thompson, Public Defender, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Ryland F. Keys, Asst. Okl. Co. Atty., W. N. Mounger, Asst. Okl. Co. Atty., Oklahoma City, for defendant in error.

NIX, Judge.

The plaintiff in error, hereinafter referred to as the defendant, was charged by information along with two other defendants with the crime of armed robbery in the District Court of Oklahoma County. Defendant was granted a severance trial before a jury, found guilty and sentenced to 20 years in the Oklahoma State Penitentiary.

The evidence of the state was that about 2:30 a. m. on the 24th of July, 1959, two men entered the Capri Motel in Oklahoma City. One asked if they had a vacant room. The clerk replied, "Yes". One of the men then confronted the clerk with a .45 automatic pistol and stated "that is fine. Turn

around". The clerk was marched to the wall and the two men took and absconded with $170 in cash from the clerk's drawer and a change box containing additional cash bringing the total to $827.55. Prior to leaving the office one of the robbers hit the clerk in the head ' with an object later learned to be a pair of pliers.

After regaining his senses the clerk called the Oklahoma City police department and gave them a description as best he could of the two men.

The testimony of police officer Chester Lee Updegrove, Jr., testified he arrested the defendant about 35 minutes after the alleged robbery in Midwest City at approximately 3:05 a. m. The officer testified he stopped a 1955 or '56 black and white Ford and the defendant stepped out and started walking back toward the police car. Upon being asked, he said his brother and one of his buddies was with him. All subjects were asked to step out of the car. The officer stated he immediately recognized the other two as being the exact description of the persons described in the radio broadcast a few minutes earlier connected with the armed robbery. In one of the subject's pockets (Paul Deibel) there was found one hundred and seventy some dollars in cash. On the other subject the officer found a .45 automatic clip and 17 rounds of ammunition. The defendants car was searched, and under the front seat was found the change box taken from the Capri Motel with an undetermined amount of cash, and also under the right hand side of the front seat was found an Army .45 caliber automatic.

As a result of these events, armed robbery charges were filed against all three subjects: Paul Deibel, David Ringer, and Gerald Thomas Ringer. During the trial of the defendant, Paul Deibel testified that the defendant came to his home about 3:00 p. m. on the 24th of July, 1959, and told him of his plans to rob the Capri Motel. Deibel stated he informed the defendant that he did not want to participate. That defendant returned to his house later the same day. That together they left and made contact with defendant's brother. All three spent some time visiting clubs while in the process of consuming two fifths of whisky. That during the course of the evening the robbery was discussed. The details were summed up in Deibel's testimony as follows:

"Q. All right. Now, tell the Court and Jury about that, if you will, please, sir? A. Well, he came over and he said he needed a third man for this armed robbery, that his brother and Gerry had already talked about it and that they both agreed on it and he needed a third man to drive the car which was supposed to be me, and I told him I didn't want nothing to do with it. And, so, that was when I was at home.

"And, then, Gerry came back after he gave his pint of blood, and we left.

"And, when we got out to the Capri, well, we had argued and drove in front of the Capri Motel, which there was only one man there and which his name was Mr. Shook.

"Then, Gerry said he couldn't go in because he was—used to work there, and Mr. Shook would identify him, so he said he would have to drive the car, and I says, 'Well, that was not the way it was planned, I was supposed to drive the car,' he says, 'Yeah; but I can't go in because of Mr. Shook'.

"So, we stopped and argued a little bit more, and finally David and I got out of the car and walked into the Capri Motel. And, David asked Mr. Shook if he had a room for two, I think it was, and, well, when Mr. Shook came up to face us, well, David pulled a 45 on him, and he said 'That is all right, just turn around'.

"So, when he turned around, I went behind the desk, and I took the money out of the counter or cash drawer. And, then, Gerry told me where the cash box would be, so I went and found that and got that.

"And, then, as I started to leave, well, David made a motion towards the man, and I turned around and hit the man on the head.

"From there, we left and went out to the car, which Gerry Ringer was in—

"Gerald Thomas Ringer: You are lying. A. I'm not lying, Ringer, and you know it. I swore to tell the truth up here, and that is exactly what I am doing.

"Gerald Thomas Ringer: You are lying, Paul. A. No; I'm not.

"As I said before, Gerry Ringer was sitting in the car with the motor running and had the right door open. And, we got in the car and drove off, and I forget exactly the way we went, but, anyway, we went back towards Midwest City, and that was when the Midwest City Police picked us up."

Lt. Hilton Geer of the Oklahoma City police department testified that he talked to the defendant the afternoon following the robbery and the following occurred:

"Q. All right, sir. Now, will you tell the Court and Jury, please, sir, what the circumstances were concerning that statement about 1:00 o'clock; just tell the Court and Jury what he said and what you said. A. Well, I talked to Gerald Ringer regarding the robbery at the Capri Motel. I also told him that his brother and Deibel had already admitted it, and all we wanted to know was his part in the robbery. Well, he made the statement that if we would turn his brother—

"Q. (Interrupting) Now, just a minute.

"Now, let me ask you this, please, sir; Did you or did you not say anything to him concerning his rights at that time? A. I told him he didn't need to tell us anything, and what he told us I could testify to. And I told him that his brother and Deibel had straightened out their part in the robbery and it would be better for him to straighten out his part. He then stated that if they would let him take all of the blame and turn his brother loose, why, he would give us a written statement on it. I told him we didn't operate that way, that we wanted just his actual part he took in the robbery. He stated that all he done was drove the automobile, the car was his, however, the car was in his brother's name because his credit wasn't any good. Well, that he drove out to the Capri Motel, and Deibel and his brother went in and robbed it. Well, he waited until they came back and entered the car, and drove to Midwest City where he was arrested—they was arrested by the Midwest City police department.

"Q. Did he or did he not in that conversation tell you that he had previously worked out there? A. Yes, sir; he had previously been employed at the motel."

Officer Geer testified that Deibel also admitted to him his participation in the robbery.

Defendant appeals upon the grounds that the evidence is insufficient to substantiate the verdict advancing as his argument that the testimony of the accomplice was without sufficient corroboration.

With this contention we cannot agree. Some of the corroborating circumstances are that within 35 minutes after the robbery defendant was caught with the two subjects in his automobile. A like amount of money was found on one of the subjects. The change box taken from the motel was found under the seat of defendant's car. A .45 automatic pistol was found in defendant's car. Defendant admitted to officer Geer his participation in the robbery. Empty whisky bottles were found in defendant's car substantiating the testimony of Deibel as to the drinking spree. With all these circumstances and defendant's admission to Officer Geer, the testimony would have been sufficient without the testimony of the accomplice Deibel to support the verdict. There was ample testimony tending to

connect defendant with the crime independent of testimony of the accomplice.

■ Defendant next complains that the prosecuting attorney made prejudicial remarks about the appearance of the defendant at the trial. The prosecutor in his closing remarks made the following statement about which the defendant complains:

"Now, Ladies and Gentlemen of the Jury, you saw Deibel come down from the jail to testify. He came down in his jail uniform. Homer, the attorney for his client, Gerald, brings him into the courtroom—dresses his client up and brings him into the courtroom."

The statement was objected to as being prejudicial to defendant's rights and asked that the jury be admonished not to consider the same. After the objection the following proceedings occurred:

"The Court: Ladies and Gentlemen of the Jury, while the defendant has a right to—All the court can say about the matter on how the defendant appears is that he has a perfect right to wear any clothing that he desires and appear before you in any clothes he desires to wear. That is his privilege. The County Attorney has no right to comment on what he wears, and he will be admonished to refrain from commenting on what he wears.

"Mr. Mounger: Counsel did not let me finish before he objected.

"The Court: Well, the explanation the Court made is he has a right to wear whatever he desires.

"Mr. Mounger: That's right. He has a right to appear any way he wants to before the Jury, and that is what I was going to say.

"Mr. Thompson: That's right. In the best light he can. We don't object to that.

"The Court: Does that satisfy counsel?

"Mr. Thompson: Yes, sir."

Though these remarks were improper and should not have been made, they are not of such a nature as to justify reversal or modification upon that ground alone. The court properly admonished the jury and the admonition apparently satisfied all parties concerned as reflected by defense counsel's admission *that he was satisfied* and no request for a mistrial was made.

■ The evidence was sufficient to support the conviction. The jury sentenced the defendant to 20 years in the penitentiary. Defendant argues that the sentence is excessive. This Court cannot help but bear in mind that the maximum which could have been assessed was life imprisonment or death in the electric chair. Armed robbery is a crime of the utmost serious nature; a crime that very easily and often does result in murder. One who at the point of a deadly weapon takes the property of another hazards a serious consequence. Under the circumstances and considering the consequences that could have been, we are not favorable to a reduction of sentence.

The judgment and sentence of the trial court is hereby affirmed.

POWELL, P. J., and BRETT, J., concur.